**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

_____

                      )
                      )
IN RE: DIMITRY JOFFE    )     MISC. BUSINESS DOCKET
                      )     No. 21-mc-91017-WGY

_____)

**DECLARATION OF DIMITRY JOFFE, ESQ.,**
**IN RESPONSE TO THE ORDER TO SHOW CAUSE**

I, DIMITRY JOFFE, ESQ., hereby respectfully submit this declaration pursuant to Local Rule 83.6.5(i)(4) in response to the Order to Show Cause entered on January 22, 2021, in the above-captioned matter. I also respectfully request a hearing pursuant to Local Rule 83.6.5(i)(4)-(5) to the extent necessary to resolve disputed issues of material fact, if any, raised in my response.

1.      I served as the lead attorney for Plaintiffs admitted _pro hac vice_ in the underlying action captioned Integrated Tech. & Comms., Inc. v. Hewlett-Packard Financial Services Co., No. 1:16-cv-10386-LTS (D. Mass.), since its inception in early 2016, when Defendants transferred Plaintiffs' complaint from the state court to this Court, until December 2020.

2.      I litigated this case against Defendants Fortune 500 companies and their affiliates represented by major law firms in New York and Massachusetts for the last 5 years as "effectively the only counsel for Plaintiffs." Order Concerning Attorney Discipline Under Local Rule 83.6.5, Integrated Tech. & Comm., Inc. v. Hewlett-Packard Financial Services Co., Civil No. 16-10386-LTS, ECF 448 (D. Mass. Jan. 1, 2021) (the "Reference Order"), at p.3.

3.      As "effectively the only counsel" for Plaintiffs in this litigation, I had personally drafted every one of the thousands of pages filed by Plaintiffs in this case; personally read  every paper filed by Defendants' legal team of five partners from two major law firms; participated in every hearing, conference and oral argument held in this case, and read every Court order; reviewed each of the 581 documents produced by Defendants and each of their 834 privilege log entries, as well as tens of thousands of the documents produced by Plaintiffs; took 7 depositions of Defendants' expert and fact witnesses and defended 4 depositions of Plaintiffs' expert and fact witnesses; and prevailed on multiple dispositive motions filed by Defendants, with all 13 counts of the operative Second Amended Complaint

and Plaintiffs' expert witness surviving Defendants' recent motion for partial summary judgment and the *Daubert* challenge.

4.    As such, I am personally familiar with the facts set out in this Declaration and affirm them to be true and correct to the best of my knowledge and belief under the penalty of perjury.

## FACTUAL BACKGROUND

### A.    2014: Meeting Styller and learning about the case

5.    I met Styller socially in the summer of 2014 in his house near Boston, and told him about my large fraud arbitration then pending in Switzerland with Quinn Emanuel as opposing counsel, and further explained to Styller that my practice in general involved litigating corporate fraud cases.[1]

6.    Styller in turn told me that he had been looking for a lawyer to sue HP on behalf of his company ICT, and explained the basic facts of the case about one HP subsidiary in India (HPFS India) selling ICT a large shipment of used computer networking equipment for resale, and then another HP subsidiary in China (H3C) having ICT sales associates arrested for reselling that equipment as bearing counterfeit H3C trademarks.

7.    I then reviewed the March 2013 draft letter from HPFS India to the Chinese Police admitting that it had sold counterfeit transceivers to ICT, Styller explained that, according to HPFS' in-house counsel David Gill who had handled the investigation, the final letter was submitted to the Chinese Police in Mandarin but in substantially the same form as the March 2013 English-language draft. I was surprised by the fact that the criminal investigation and detention of ICT's sales

---

[1] Quinn Emanuel's lead attorney in that Swiss arbitration, Stephen Jagusch, QC, later wrote the following reference: "I spent much of a recent summer locking horns with Dimitry. It was a four week hearing with billions of dollars at stake and involving multiple procedural and substantive laws. The issues in the case were far reaching and complex. A major part of Dimitry's case required a finding from the Tribunal of fraud in order to overcome contractual exclusions and limitations of liability. The documentary record was voluminous, spanning many years. There were dozens of fact and expert witnesses. Dimitry demonstrated complete mastery of very complicated facts and conducted skillful and effective cross examinations. He succeeded in persuading the arbitrators that a fraud had indeed been committed. Having seen Dimitry in action, I do not hesitate to endorse his skills as a forensic document examiner, cross examiner, strategist and advocate."

associates did not cease after HPFS India supposedly filed that letter with the Chinese Police.

8.      I then requested the final April letter to be translated from Mandarin to English as accurately as possible. To the best of my recollection, Marina Vasilyeva translated the letter at the time, and the comparison of the March Draft and the translated April Final versions revealed that the key admissions about the counterfeiting activities taking place before the sale of the equipment to ICT had been deleted from the final version.

9.      I then reviewed a contemporaneous email from David Gill to ICT's counsel Lester Riordan stating that the filed April Letter was substantially the same as the March Draft, which statement turned out to be false. Based on that finding, I became intrigued by the case; however, at that time in 2014, I could not convince the law firm I was working at then to take the case on contingency. Meanwhile, Styller drove a hard bargain with respect to the engagement terms, ultimately antagonizing me, and our relationship completely ceased at that time.

**B.      2015: drafting the original complaint to preserve Plaintiffs' claims from expiration.**

10.      Towards the end of 2015, Styller visited me in New York to try to convince me again to take the case on behalf of ICT. I told Styller that if I were ever to take the case, I would do so only on behalf of both ICT and its sales associates who had been incarcerated in China. Styller agreed in principle, and so did the Chinese plaintiffs.

11.      However, there was still no engagement agreement reached at the time, while the 3-year statute of limitations applicable to some of the claims was about to expire on or about December 10, 2015. Accordingly, I drafted what the Reference Order called "the original, concise, twenty-three-page complaint on behalf of Integrated and the three employees imprisoned in China." ECF 448 at 3.

12.      Styller's regular outside counsel Lester Riordan, who had represented ICT in the underlying events but never himself brought any action against HP, filed the complaint in the state court after reviewing the draft and making some stylistic edits. As Attorney Riordan later confirmed in his withdrawal papers (which he filed after threats of sanctions from Defendants and the Court in connection with the Second Amended Complaint), ECF 71 at 2:

> Movant [Attorney Riordan] does not have any control or input in the case and does not have the ability to impact the case (as

Plaintiffs entrusted the case to Attorney Joffe at the inception of the case). Movant has taken steps to ensure that Attorney Joffe has all documentation pertaining to this matter. Further, Movants role has largely been limited to facilitating the filing of the papers during the initial stages of litigation during the time Attorney Joffe was seeking admission and registering for electronic filing capabilities. Attorney Joffe is in control of the matter, has drafted and litigated all motions and has been duly admitted by this Court.

**C.     2016: The Court grants my request to replead with additional particulars of fraud for Rule 9(b) purposes, denies Defendants' motion to dismiss the original complaint as moot.**

13.     During oral argument on Defendants' motion to dismiss the original complaint, the Court granted my request to amend the complaint on Rule 9(b) grounds to add more particulars of the alleged fraud, and denied Defendants' motion as moot in favor of the upcoming Amended Complaint. ECF 44, July 8, 2016 Hearing Tr. 75-76.

14.     The Reference Order incorrectly states in this regard that I requested leave "to file an Amended Complaint in light of the issues concerning the act-of-state doctrine" – in fact, the leave was requested and granted expressly to plead additional particularized facts of the alleged fraud for Rule 9(b) purposes.

15.     Within 10 days of the hearing, on July 18, 2016, I filed the Amended Complaint with additional particulars of the alleged fraud for Rule 9(b) purposes, necessarily expanding its page count (to 43 pages).

16.     Defendants then moved to dismiss the Amended Complaint. In the course of briefing those motions, I put Defendants on notice that, "pursuant to Rule 15 of the Federal Rules of Civil Procedure, the Plaintiffs intend to file a Second Amended Complaint, which would allege that the post-arrest actions of the Defendants, as well as those of certain additional parties to be joined as defendants, constitute not merely negligence but an intentional fraudulent cover-up." ECF No. 48.

**D.     2017: The Court grants leave to file their Second Amended Complaint after initially denying it, and restores the previously dismissed false imprisonment claim.**

17.    On January 4, 2017, I moved for leave to file the Second Amended Complaint, explaining it as follows:

> Briefly, the 120-page Second Amended Complaint, which is annexed hereto and speaks for itself, alleges that the current and proposed Defendants, all of whom are part of the former Hewlett-Packard Company (except for Gibbons P.C., which was HP's outside counsel), first defrauded Plaintiffs by selling them the Equipment as genuine HP Equipment for resale purposes; then framed the Plaintiffs by procuring their arrest on charges that they were reselling counterfeit equipment; then prolonged their horrifying detention in Beijing's infamous Haidian Detention Center by withholding exculpatory evidence that would have secured their release; and then embarked on an outrageous campaign of lies, threats, and intimidation against Plaintiffs, designed to cover up Defendants' own crimes and fraud.

> The Second Amended Complaint further alleges that the cover-up campaign was continuing and successful until Plaintiffs and their counsel had managed, with the benefit of hindsight and through a careful dissection of Defendants' numerous lies and concealments, and as the case developed further in motion practice, to figure out Defendants' nefarious scheme and to present it, with significant supporting evidence and with the requisite particularity and plausibility, in the Second Amended Complaint.

> Accordingly, the Second Amended Complaint adds a number of new parties and claims, all arising out of and closely connected to the initial claims as set forth in the original and amended pleadings for purposes of Rule 15 (c) and Rule 20 of the Federal Rules of Civil Procedure.

> Any purported delay in Plaintiffs' figuring out the depths of the Defendants' fraud and the many strands of their numerous lies now set out in the Second Amended Complaint is a testament -- not to be confused with a compliment -- to how well the Defendants' cover-up scheme was designed and executed.  Any such delay was not unreasonable, particularly in light of the early procedural posture of the case, with no discovery so far, and no prejudice to the Defendants or the proposed defendants.

18.    On January 13, 2017, the Court denied the motion without prejudice, ruling as follows (ECF 67):

Plaintiffs filed a Motion for Leave to File a Second Amended Complaint (Doc. 64) on January 4, 2017. The Motion and proposed Second Amended Complaint ("SAC") suffer from several problems. First, the Motion has been filed without a supporting memorandum, in violation of Local Rule 7.1(b)(1). Second, Plaintiffs fail to explain which parties or claims they seek to add or the reasons supporting the proposed additions, so as to justify why the SAC is 119 pages and 424 paragraphs long (compared to their original complaint, which was 15 pages, and their First Amended Complaint, which is 40 pages). Third, Plaintiffs make a conclusory allegation that the delay between when they filed their First Amended Complaint, in July 2016, and when they filed the instant Motion is a "testament" to Defendants' deceit. Doc. 64 at 2. However, Plaintiffs' counsel does not explain how any alleged deceit could possibly have delayed him from learning of some of the new claims and parties he has added, such as the loss of consortium suffered by certain Plaintiffs' family members or the harm allegedly caused to ICT's CEO. Fourth, on preliminary review of the proposed SAC, the Court has concerns about, inter alia, its compliance with FRCP 8 and the viability of fraud claims against certain individual defendants who have just been added. The Court warns that any party bringing fraud claims that patently fail to comply with FRCP 9(b) risks being sanctioned pursuant to FRCP 11. For all of these reasons, the Motion for Leave to File a Second Amended Complaint (Doc. 64) is DENIED. The denial is WITHOUT PREJUDICE to Plaintiffs seeking leave after the Court rules on the pending motions to dismiss the First Amended Complaint, provided Plaintiffs seek leave with a sufficient and proper motion. Defendants' Motion for Extension of Time to respond to the Motion for Leave (Doc. 66) is DENIED AS MOOT.

19.     On January 18, 2017, I filed a motion for reconsideration of the Court's order, addressing each of the four grounds of the Order. ECF 68.

20.     On January 25, 2017, following the Court's January 13, 2017 ruling and Defendants' threats of a Rule 11 motion for sanctions, Plaintiffs' local counsel Attorney Riordan sought to withdraw. ECF 71.

21.     Faced with severe budget constraints, Plaintiffs then sought to proceed without local counsel, to be represented solely by me. Accordingly, on January 26, 2017, pursuant to the Court's electronic order entered earlier that day requiring me

to explain my "interpretation that local counsel is not required in this case" (ECF 72), I filed a response arguing that the continuous presence of local counsel was not required by either Local Rules or any other controlling authority. ECF 73. After briefing, the Court denied that motion, compelling Plaintiffs to retain another local counsel. ECF 78.

22.     On January 24, 2017, the Court denied Defendants' motions to dismiss the Amended Complaint except that the Court dismissed the false imprisonment claim. ECF 69.

23.     In the same Order, the Court denied Plaintiffs' motion for reconsideration of its prior order denying leave to file the SAC, but granted Plaintiffs further leave to file a motion for leave to file an amended complaint. Id.

24.     On February 8, 2017, Plaintiffs timely filed their motion for leave to file the Second Amended Complaint. ECF 79. After briefing, on July 28, 2017, the Court granted Plaintiffs' motion in part, allowing them to add new Family Plaintiffs and new Defendants HPE and HPI, to bring new intentional tort claims against all Defendants, and to reinstate their previously dismissed false imprisonment claim (ECF 95). The Court in the Order also warned Plaintiffs of their "obligation to file a revised Second Amended Complaint conforming to Rules 8 and 12," and further warned them that "if they file a Second Amended Complaint that fails to conform to the Court's Order, it will consider dismissing this action under Federal Rule of Civil Procedure (hereinafter, 'Rule') 41(b)." ECF 95 at 2-3.

25.     Plaintiffs timely filed their revised 13-count, 93-page Second Amended Complaint on August 4, 2017 (ECF 101). The Second Amended Complaint has remained the operative pleading in this action and most recently survived Defendants' motion for partial summary judgment with all of its counts intact. Every word of that 93-page complaint was drafted by me, as was every word of its predecessor pleadings that developed the theory of the case, and every word of the multiple briefs that had successfully defended those pleadings.

### E.     2018: commencement of discovery and mediation

26.     In January 2018, discovery commenced with Defendants' consulting experts' inspection of the Equipment. Defendants then represented to the Court that their consulting experts had found the majority of the inspected transceivers to be authentic based on their serial numbers, and proposed mediation based on those findings.

27.    Based on Defendants' representations, the parties then agreed to mediation and on May 24, 2018, jointly requested that "all other procedural and administrative aspects of the matter be stayed sine die until the conclusion of mediation, with the understanding that the current Scheduling Order will be amended accordingly in the event that the mediation does not resolve all issues in the case." ECF 154 pp. 1-2.

28.    During the status conference held on May 29, 2018, counsel for the parties further advised the Court that they were interested in the Court's mediation program  and requested to stay the deadlines pending the outcome of the mediation. ECF 156. Later that day, the Court issued an order referring the case to Judge Dein for Alternative Dispute Resolution. ECF 157.

29.    On May 31, 2018, the Court issued an electronic Order Regarding ADR Conference, which provided inter alia: "Counsel are directed to be present with their clients or representatives thereof with full settlement authority."

30.    Contrary to the ADR Order, none of the five Defendants in this action or their representatives (other than their regular litigation counsel) appeared at the ADR conference. By contrast, I attended the conference with Plaintiffs Alex Styller, Jade Cheng and Caroline Marafao Cheng – the full complement of the Plaintiffs present in the U.S., who had full settlement authority from all the other Individual and Family Plaintiffs residing in China.[2]

31.    On August 7, 2018, Magistrate Dein filed an Electronic Report of ADR Provider, reporting that the mediation was unsuccessful and stating in particular that "this case should be restored to your trial list." ECF 163,

32.    On November 8, 2018, Plaintiffs filed a motion to restore the case to trial calendar and amend the scheduling order (ECF 168), explaining:

> The mediation was unsuccessful, as Judge Dein noted in her
> August 7, 2018 report (Docket No. 163). At that time, Judge
> Dein noted that the case should be restored to the Court's trial

---

[2] Defendants' failure to appear at mediation also violated Local Rule 16.4(c)(2)(C), which provides: "The mediator shall meet, either jointly or separately, with each party and counsel for each party and shall take any other steps that may appear appropriate in order to assist the parties to resolve the impasse or controversy. A representative of each party with settlement authority must attend each mediation session unless alternative arrangements are approved by the mediator."

list. Plaintiffs anticipated that the Court would issue a revised scheduling order, adjusting the discovery and other deadlines to account for the time spent preparing for and participating in the mediation—roughly three-and-a-half months.

By October, it was apparent that the Court did not intend to proceed that way, and Plaintiffs' counsel reached out to counsel for Defendants in an effort to agree on a revised discovery schedule. In response, Defendants' counsel took the position that discovery in this action should be stayed pending the resolution of Defendants' motion to dismiss in a related action brought by Ryan Quinn earlier this year in Case No. 18-cv-10705, based in large part on Plaintiffs' own complaint and brought more than two years after Plaintiffs commenced the instant Action.

Plaintiffs believe that any further delay of discovery is inappropriate, particularly a delay in favor of the later-filed action, and request that the Court enter an order adjusting the existing deadlines, including discovery deadlines, by seven months to account for the time devoted to the failed mediation proposed by Plaintiffs.

33.     By electronic order entered November 13, 2018, the Court stayed discovery in this action pending the resolution of the pending motions to dismiss in the Ryan case, denying Plaintiffs' motion as moot. ECF 170.

### F.     Plaintiffs' initial overproduction of documents, promptly corrected

34.     Plaintiffs disclosed in the ESI protocol that they had lost certain responsive ESI prior to the litigation and undertook to search for ESI "on relevant custodians' computer hard drives, USB attached hard drives, and cloud data storage/sharing services," as well as "in PST files, to the extent any exist," in the hopes of finding the missing ESI.

35.     According to Plaintiffs' e-discovery vendor Target Litigation, Plaintiffs collected and turned over to Target Litigation over 3 million documents overall. Subsequent searches by Target Litigation using Defendants' ESI search terms yielded hundreds of thousands of "hits." Even though Plaintiffs sought to modify certain search terms returning too many false "hits," and though Defendants had agreed to some modifications while refusing others, the modified search string still returned over 200,000 documents with search "hits."

36.     Plaintiffs' budget constraints made a subsequent human review of over 200,000 documents turned up by running Defendants' search terms impossible as a practical matter. Accordingly, Plaintiffs produced all the documents responsive to Defendants' ESI search terms, even though that production contained admittedly irrelevant documents.

37.     In the following weeks, I undertook an exercise to eliminate irrelevant documents from Plaintiffs' overproduction, and produced a narrower set of 60,000 responsive documents. The Court subsequently appointed an electronic discovery expert to assist the parties with the remaining issues concerning Plaintiffs' production, and the matter was resolved following the Court's adoption of the expert's report in October 2019.

38.     Defendants, by contrast, produced 581 documents in total, from four custodians. Three of the five Defendants – HPE, HPI, and HPFS India – produced no documents at all.

### G.     Motions to compel

39.     On July 22, 2019, Defendants moved to compel Plaintiffs to produce additional documents. ECF 207. Defendants' motion on its face did not comply with Local Rule 37.1(b) in that it set out the challenged Responses and Objections not in the body of the brief as required by the Rule but in the attachments to it.

40.     On August 23, 2019, Plaintiffs moved to compel, arguing that Defendants' 581-document production was a sham, and seeking to compel Defendants HPE, HPI and HPFS India to produce documents, and the other Defendants to supplement their deficient productions.

41.     Defendants moved to strike Plaintiffs' motion and, following the opening and the response briefs permitted by Local Rules, sought Plaintiffs' consent to a reply brief. Plaintiffs did not consent to Defendants' request (which was their right to do under Local Rules) because they considered Defendants' motion to strike (rather than responding to the motion on the merits) as part of Defendants' efforts to exhaust Plaintiffs' scarce human and financial resources through scorched-earth litigation tactics.

42.     On September 12, 2019, the Court ordered (ECF 230):

Apparently, Plaintiffs oppose the Court allowing Defendants the opportunity to submit further information and briefing to the

> Court. Accordingly, Plaintiffs shall no later 9:00a.m., Friday,
> September 13, 2019, file a response to the Motion For Leave to
> File a Reply stating the grounds on which they believe the Court
> should preclude Defendants from submitting a reply. This
> response is limited to three pages. This response is not the
> forum to address the merits of the Motion to Strike, the Motion
> to Compel or the claims in the Complaint, but only the narrow
> question posed by the pending motion which Plaintiffs oppose:
> whether to permit Defendants to file a reply.

43.     As directed by the Order, I filed a 3-page response later that day (ECF
231); the Court nevertheless admonished me for advocating Plaintiffs' position in
opposing Defendants' request and filing a response.

44.     Plaintiffs' motion to compel was styled in the same manner as
Defendants' motion; nonetheless, on September 16, 2019, the Court denied
Plaintiffs' motion for failure to comply with Local Rule 37.1(b) (ECF 234) -- while on
the same day granting Defendants' motion in part (ECF 236) even though it had
failed to comply with Local Rule 37.1(b) in the exact same manner as Plaintiffs'
motion.

45.     On October 8, 2019, Plaintiffs filed a renewed motion to compel,
accompanied by a routine motion to file certain exhibits under seal, and a motion to
file an oversized brief in support of the motion to compel. As the Reference Order
states, "the Court ordered Attorney Joffe to file certificate of conferral as required
by Local Rule 7.1(a)(2) for two motions that had not included them," which I did the
next day.

46.     By contrast, Defendants' identically styled motion to seal, also filed
without a certificate of conferral (ECF 216), was granted by the Court on September
16, 2019 without any mention of Local Rule 7.1(a)(2). See ECF 234.

47.     The Reference Order also takes issue with my citations to the non-final
"Original ESI Protocol" instead of the revised "Final ESI Protocol" in the briefing on
the motion to compel. However, the incorrect citation had no effect on the merits or
substance of the related arguments because the cited provisions of the Original ESI
Protocol were identical to the corresponding provisions in the Final ESI Protocol.
Accordingly, the Reference Order's finding that "much of what was contested in the

motion to compel was directly at odds with the revised ESI Protocol" is not supported by the record.[3]

48.    Moreover, there is no finding in the Order that I "had repeatedly misrepresented the record" on the motion. This is a serious charge, but it has no support either in the Court's Order itself (ECF 280), and not in the underlying motion papers (ECF 249). To the best of my knowledge, I have never misrepresented the record, let alone "repeatedly," and I would be happy to address every specific example of my purported misrepresentations, if confronted with any.

## H.    Motion for reconsideration

49.    On November 25, 2019, I filed a motion to reconsider the Court' denial of Plaintiffs' motion to compel, for the following principal reasons.

---

[3] The Court itself recognized so much with respect to one of the citations, stating in the Order denying motion to compel, ECF 280 at n.7 (emphasis added): "The plaintiffs do complain that the defendants improperly deduplicated items in contravention of the Original ESI Protocol, Doc. No. 249 at 11 n.6, but that complaint is utterly without merit, as the Final ESI Protocol supersedes the original and sensibly permits exactly what defendants did: dedupe email across custodians, while deduping non-email documents only within custodians. Doc. No. 183 at 14. In any event, the Original ESI Protocol permits the very same thing. Doc. No. 149 at 14." (In that instance, Plaintiffs complained that Defendants had improperly deduplicated their ESI custodian O'Grady's non-email documents, which was not permitted under the ESI Protocol, whether the Original or the Final. See ECF 249 at 11 n.6 ("In light of Mr. O'Grady's involvement in both the initial 2011 sale and the 2013 events, it is unlikely that his ESI contained no responsive documents, which documents (other than emails) should not have been deduplicated against other custodians.").

The other references in Plaintiffs' motion to compel were likewise made to the provisions of the Original Protocol that remained unchanged in the Final Protocol, see ECF 249 at n.3 (reference to the "native format" production identical in both protocols); id. at pp. 12-13 (reference to Defendant HPI's hosting "Microsoft Exchange user accounts for all of the Corporate Defendants using the '@hp.com' email domain" until March 2015, when it migrated them to Office 365" in the Original Protocol – which is likewise identical to the Final Protocol. Finally, Plaintiffs referenced the Original Protocol in stating that "Defendants also succeeded in excluding James Kwok and Meng Tao as ESI custodians by representing that they had not been employed by Defendants but by 'other HP-affiliated entities,'" citing Dkt. 149 at p. 19, which remained true under the Final Protocol as well.

50.   ***First***, I had discovered that 17 highly relevant emails, certain to exist because they were preserved and produced by Plaintiffs themselves, were missing from Defendants' ESI custodians' email production. All of the missing emails were responsive, nonprivileged, within the relevant time period and within the ESI Protocol custodian and search parameters. I discovered the first missing email on or about October 25, 2019, proceeded to investigate further, and on November 12, 2019, I advised counsel for Defendants about the missing emails, stating that the "key issue is not with these particular missing emails, which Plaintiffs themselves have preserved and produced – the issue is rather with an unknown number of other responsive emails, to which Plaintiffs were not parties, that may be likewise missing from Defendants' production for the same reason." ECF 283-19 at p. 5.

51.   ***Second***, Defendants' report to the Court concerning their document production revealed the existence of "the Corporate Defendants' share drive" to which their employees purportedly uploaded "all responsive non-email files . . . as well as key correspondence" prior to discovery in this action. ECF 279 ¶ 2. According to Defendants, they then searched that Share Drive without any limitations on custodians and produced "all responsive non-privileged documents in the share drive." Id.

52.   However, Defendants' entire document production, necessarily including the Share Drive collection, came from only four HPFS employees -- who also happened to be the only four subsequently designated ESI custodians producing any emails. No ESI of any other employees (among more than a hundred involved in the underlying events) who would have allegedly uploaded their responsive document to the Share Drive had been produced.

53.   As the Reference Order explains, the Court denied Plaintiffs' motion on the basis that "documents unread until well after discovery closed were not a basis to compel production or reopen discovery." ECF 448 at 10.

54.   Contrary to the Court's finding, I had slowly read each page of Defendants' documents at the time of their production, and reread them several times subsequently. I had likewise slowly read each line of Defendants' 71-page 834-entry privilege log. Partial results of my review were first summarized in my July 12, 2019 letter of deficiencies on 10 single-spaced pages, and further presented in the three subsequent motions to compel and for reconsideration. Plaintiffs Styller and Cheng as well had carefully reviewed Defendants' production and provided me with their copious notes. However, figuring out which documents should have been included in the production but were not required an additional, purposeful, and

targeted search beyond a mere document review, however carefully conducted, and neither Plaintiffs nor their counsel should bear blame for not discovering Defendants' ESI deletions earlier than they had done.

### I.      Deposition of Defendants' expert Raina

55.      During the deposition of Defendants' expert witness Shelley Raina, Plaintiff Styller stated to Michael Bunis, Defendants' counsel defending the deposition: "Are you on drugs? Michael, are you on drugs?" ECF 331-1 at 8-9.

56.      I immediately admonished Styller not to talk to Defendants' counsel, and made a statement to that effect on the record. ECF 331-1 at 8-9 ("I instructed the plaintiff not to talk to you.").

57.      Likewise, after Mr. Bunis had informed me that Mr. Styller had spoken to Mr. Raina in the restroom during the break -- telling him to "say the truth and you'll be fine" -- I again instructed Styller not to speak to the other side, and he seized doing so.

58.      Both comments by Styller came as a complete surprise to me; I was the only counsel representing Plaintiffs on that deposition and was otherwise busy questioning the expert witness, handling the exhibits, and dealing with numerous objections and obstructive conduct by defending counsel. I believe that by instructing the plaintiff not to do it again I had discharged my responsibilities in the only way possible under these circumstances.

### J.      Cross-motions for summary judgment

59.      The Reference Order states that "[o] April 16, 2020, Attorney Joffe filed a memorandum in opposition to [Defendants'] summary judgment motion 'and in support of Plaintiffs' cross-motion, although no such motion had been filed," (ECF 448 at 11) – but Plaintiffs' cross-motion was filed the very next day, April 17, 2020, ECF 334, along with a memorandum in opposition to Defendants' *Daubert* motion.

60.      The Reference Order repeats Defendants' complaints about my purported failure to confer with Defendants concerning Plaintiffs' cross-motions. However, those complaints had been refuted in my opposition papers and dismissed by the Court at the time, when the Court denied Defendants' motion to strike based on the purported failure to confer; the Court then denied Defendants' motion for summary judgment on the merits.

### K.    Spoliation motion

61.    The Reference Order states that "the Court allowed Defendants' motion for sanctions in part, finding that 'Plaintiffs willfully and recklessly destroyed various kinds of evidence that was potentially relevant to this litigation after their duty to preserve such evidence had been triggered." ECF 448 at 12.

62.    ***First***, as a threshold matter, there is no dispute that I was not involved in the case when the alleged spoliation took place, and could not be held responsible for it. By the time I joined the case, that evidence had already been lost, and for that reason I undertook extensive efforts to recover the lost data, leaving no hard drive unturned and leading to over 3 million documents collected and provided to Plaintiffs' e-discovery vendor Target Litigation, with the resulting overproduction of over 200,000 documents responsive to Defendants' search terms (corrected as promptly as was possible, within a few weeks).

63.    ***Second***, the Court ruled on the motion as follows: "the Court orders that in connection with Plaintiffs' claims and Defendants' corresponding defenses thereto, the Court will consider imposing all of the following sanctions: (a) permitting the introduction of evidence, by all parties, regarding the destruction or loss of evidence as well as the reason(s) therefor; (b) precluding testimony from Plaintiffs regarding the content of any unpreserved ESI; and (c) an appropriate instruction permitting the drawing of an adverse inference."

64.    Accordingly, on the face of the Order, the Court did not impose any sanctions on Plaintiffs at the time but rather stated that it "will consider imposing . . . sanctions," including "permitting the introduction of evidence, by all parties, regarding the destruction or loss of evidence," which could include the introduction of evidence by Plaintiffs of Defendants' own deleted ESI and destroyed TT Global transceivers.

### L.    Events leading up to the August 28, 2020 Status Report and the September 2, 2020 motion for discovery

65.    On July 17, 2020, after the parties' partial summary judgment and other motions had been fully briefed and argued, I stated in a letter to Defendants' counsel: "I suggest we meet and confer (telephonically or by ZOOM) regarding the deposition format and schedule. Please let me know your availability next week." ECF 373-2.

66.     Counsel for the parties then met and conferred telephonically on July 29, 2020, to discuss Plaintiffs' proposal to take all depositions remotely due to the coronavirus pandemic. At the conclusion of that meet-and-confer, Defendants' counsel reserved their position on this issue pending further consultation with Defendants. ECF 373-1 ¶ 3.

67.     On August 12, 2020, having heard nothing further from Defendants' counsel for two weeks, I wrote to them: "Please let me know defendants' position re: remote depositions, as discussed." ECF 373-3.

68.     On August 13, 2020, the Court issued an order denying Defendants' summary judgment motion and requesting the parties to provide a status report in two weeks "presenting their respective position as to the further discovery and motion practice required to advance of the trial scheduled in this case." ECF 369 at 26.

69.     On August 14, 2020, Defendants' counsel Mr. Saso responded to my request to disclose Defendants' position on remote depositions, stating: "We will return to you shortly re: depositions." ECF 373-4.

70.     Ten days later, on August 24, 2020, Mr. Saso wrote: "We expect to be able to discuss this week's Status Report in the next few days. We'll reach out as soon as possible." ECF 373-5.

71.     During the subsequent meet-and-confer on August 26, 2020, Defendants' counsel stated with respect to remote depositions that a protocol should be negotiated first and submitted to the Court, separately from and following the status report (after Labor Day). ECF 373-1 ¶ 7. I, in turn, informed Defendants' counsel that Plaintiffs were in discussion with another law firm looking to join the case, and asked that Plaintiffs' position be submitted at the same time as the remote deposition protocol (shortly after Labor Day) to allow Plaintiffs time to consult with their anticipated new counsel. Id.

72.     On August 27, 2020, Mr. Saso circulated a draft joint status report. ECF 373-6. With respect to Plaintiffs' proposed depositions, the draft joint report stated: "Plaintiffs propose to take the same ten depositions as were proposed in the Joint Status Report filed on February 27, 2020. [ECF 308 at 14.] Consistent with Defendants' position in the February 27, 2020 Joint Status Report, Defendants do not object to Plaintiffs' proposed deponents, but reserve their right to object to any topic listed in a formal Notice of Deposition pursuant to Rule 30(b)(6) once properly served. Likewise, Defendants do not object to Plaintiffs naming Ross West and/or

Jessica Liu as potential deponents, but note that neither individual is an employee of any Defendant as of this date."

73.     In response to that email, I wrote: "Paul -- as I mentioned during our meet and confer yesterday, we are in discussion with a big law firm looking to join the case. Our contacts there are on vacation this week (as am I), and we were not able to discuss your proposal in the 4 hours you gave us to respond. Plaintiffs would like to have the opportunity to have their views on this matter, and we would like to reserve our position on the deponents and submit it when the remote deposition protocol is submitted after Labor Day." ECF 373-8.

74.     I took that position at the direct instructions of Plaintiff Styller, who was at that time conducting negotiations with Quinn Emanuel to which I was neither a party nor a privy.

75.     In response, Defendants filed the status report (ECF 371), citing my last email but omitting all prior meet-and-confer correspondence on the issue of depositions referenced above. Though styled as Defendants' own, the status report repeated the draft joint report's statements with respect to Plaintiffs' 10 proposed depositions and notes no objections by Defendants to those depositions. Therefore, Plaintiffs believed their rights to pursue deposition discovery were preserved by the status report.

76.     On August 28, 2020, the Court issued an order granting Defendants' request to take 12 depositions and stating that "no other depositions are authorized." ECF 372 at 3.

77.     On September 2, 2020, I filed a motion to allow Plaintiffs' deposition discovery. ECF 373. The motion argued, firstly, that Rule 30 permits Plaintiffs to take up to 10 depositions without leave of the Court. Secondly, the motion argued that:

> Denying Plaintiffs any deposition discovery will severely prejudice their ability to prepare for trial in this case, where (a) three of the five defendants (HPE, HPI and HPFS India) produced no documents whatsoever and the remaining defendants HPFS and Gill produced only 580 documents (and claimed privilege with respect to 833) despite the involvement of well over a hundred of Defendants' employees in the relevant events; (b) Defendants deleted relevant emails and deliberately destroyed the transceivers they had sold to TT Global from the same Commonwealth Games batch as the transceivers sold to

ICT due to the transceivers' "questionable" nature and origination -- a key piece of evidence in the PSB criminal investigation and in this case; and (c) the Court denied Plaintiffs' three attempts to compel Defendants to produce documents (Doc. Nos. 234, 280, and 300), and has now ordered the document discovery closed, Doc. 372 at 3. Subjecting Plaintiffs to 12 depositions (after they had produced over 60,000 documents) without allowing them to take any of their own, and thus limiting their total discovery to the 580 documents produced by only two of the five Defendants, would create an extremely uneven playing field in this action.

78.     On September 9, 2020, the Court issued an order allowing Plaintiffs' motion and permitting them to proceed with the requested depositions. ECF 375. I personally took 6 of those depositions from October 21 through November 12, 2020.

## M.    Service of subpoena on third-party witness Alexander Pekar

79.     Plaintiffs agreed that I would represent former ICT employees on their depositions when and if they were subpoenaed to testify, and I so informed Defendants' counsel.

80.     However, neither Plaintiffs nor Defendants have ever agreed to accept service of subpoenas on behalf of their former employees. Accordingly, Defendants proceeded to serve Plaintiffs' former employees Alexander Pekar, Marina Vasilyeva, Val Faybush, and Tony Grabkovsky with deposition subpoenas as required by Rule 45 of the Federal Rules of Civil Procedure.

81.     All former employees but Mr. Pekar were properly served, and duly appeared for their scheduled deposition; I defended Messrs. Faybush's and Grabkovsky's depositions, while Plaintiffs' then local counsel Joshua McGuire defended Ms. Vasilyeva's.

82.     However, Defendants were unsuccessful in serving Mr. Pekar and sought my assistance in securing his deposition, leading to extensive correspondence on the subject, see , e.g., ECF 395-1 through 395-5.

83.     On October 27, 2020, in response to Mr. Saso's letter earlier that day demanding that I "immediately provide a response concerning service upon Mr. Pekar and provide a date upon which he is available for his deposition," (ECF 395-1), I wrote (ECF 395-2):

Paul -- I did inform you that I would inquire of Mr. Pekar with respect to the subpoena when I speak with him, and I have not been able to speak with him since then. While I expect to connect with Mr. Pekar and then convey his preferences as to the service of the subpoena, I have never promised you that he would accept service as you would prefer him to, simply because I did not know it then (and do not know it now). Whether or not you have suspended attempts at serving Mr. Pekar is solely your decision. I note in this respect that you have not been particularly helpful with respect to serving Defendants' former employees, so the tone of your letter is not comme il faut.

84.     On October 28, 2020, I further wrote to Defendants' counsel:

Mr. Pekar has gotten back to me and stated that he had not been served with the subpoena, and that as far as schedule was concerned, he could be available 12-3 pm EST on Nov. 9, and on similar 3-hour sessions at the same time for the rest of that week (Nov. 10-13). He is also free the week after that (Nov. 16-20). Nov. 10-13 are fully booked, with 2 depositions each day. My proposal is that I would accept the subpoena on his behalf and Mr. Pekar would appear on Nov. 9 at 12 pm for 3 hours, with reservation of rights to call him for the remaining time at a later mutually convenient date. Please let me know if this is acceptable. Alternatively, and in light of the many unscheduled loose ends referenced above, I suggest the parties jointly seek a one-week extension for depositions and spread out all the remaining depositions without creating a last-minute crash, for which there is no need. We can combine our joint request for a one-week extension of depositions with your consented-to request to move the medical exams to the experts' phase.

85.     On October 31, 2020, Defendants' counsel Mr. Saso responded with additional demands on Mr. Pekar's time at variance with Mr. Pekar's offer, effectively rejecting it and leading me to respond as follows on October 31, 2020: "I offered to accept service of Pekar's subpoena on the condition of his appearing for 3 hours on Nov. 9, and any further days, if required, to be scheduled at a mutually convenient time. You have rejected that offer, so feel free to serve him with your subpoena, all our rights reserved." ECF 395 at 4.

86.     On November 2, 2020, Defendants' counsel Mr. Saso wrote an email to me: "Dimitry, I am just following up to let you know that Mr. Pekar was served by

posting the subpoena at the gate to his house and by sending a copy via FedEx." ECF 395-3.

87.     I responded later that day: "Paul -- I have not heard anything from Mr. Pekar, who I believe has been travelling, but Plaintiffs will move to quash the subpoena for invalid service. Rule 45 requires personal service on the person named in the subpoena, and does not authorize your 'nail and mail' attempt. See Humphrey v. Town of Spencer, CIVIL ACTION No. 4:14-40127-TSH (D. Mass. Mar. 21, 2016)." ECF 395-4.

88.     On November 4, 2020, at 6:47 pm, Defendants filed a motion to serve Mr. Pekar by alternative means (ECF 393).

89.     Pursuant to Local Rule 7.1(b)(2), Plaintiffs' response was due within 14 days after the motion was served, but the issue of service on Mr. Pekar came up during a status conference held on November 10, 2020, whereupon I advised the Court that I had not heard further from Mr. Pekar and could not accept service of subpoena without his authorization, knowledge or consent, and asked for an opportunity to discuss the matter with Mr. Pekar.

90.     Following the hearing, the Court issued an order stating: "Regarding service of Mr. Pekar, Plaintiff is not agreeing to waive service and would like to discuss with his client to see if he will accept service. Plaintiff is to file a status report by close of business Tuesday 11/17/20 as to whether he accepts service and the date of the deposition or that he will contest service." ECF 399.

91.     On November 17, 2020, I filed a status report advising the Court that "[f]ollowing the hearing, the undersigned counsel for Plaintiffs contacted Mr. Pekar and was authorized by Mr. Pekar to accept service of the deposition subpoena on his behalf. The undersigned has advised Defendants' counsel accordingly, and now respectfully updates the Court." ECF 405.

## N.     Michael Bunis' deposition misconduct

92.     I took depositions of Defendants' expert witness Shelley Raina in February 2020 and of their fact witnesses J.T. Silvestri, Tom Harris, David Gill, Kevan Bartley, James O'Grady, and Stuart Patterson in October-November 2020.

93.     All of these depositions were defended by Michael Bunis of Choate, Hall & Stewart LLP, who had systematically and deliberately obstructed the deposition process.

94.   I summarized my complaints about Mr. Bunis in an email to Defendants' counsel Mr. Saso dated October 31, 2020, as follows:

> First of all, I have no issues with Defendants' other counsel, including yourself and Anthony, conducting depositions (beyond routine skirmishes). I do, however, object to Mr. Bunis' continuous deposition misconduct -- not so much his numerous senseless interruptions and unilateral calls for breaks in the middle of a pending line of questions, but specifically to:
> (a) his instructions to the witness not to answer my questions until the witness reads the complete exhibit put in front of him,
> (b) his instructions to the witness not to answer my questions until Mr. Bunis himself reads the complete exhibit put in front of the witness, and
> (c) his related objections to my questioning the witness with relevant extracts or screenshots in lieu of voluminous files by way of dealing with Mr. Bunis' obstructionist instructions as "misleading the witness."
>
> With respect to (a), Mr. Bunis is on the record instructing or committing to instruct Mr. Harris not to answer my question until Mr. Harris reads the entire exhibit regardless of whether the exhibit is a 12,000-line Excel spreadsheet or a 71-page, 834-line privilege log, and irrespective of whether my question requires the witness to have any knowledge of the substance of those exhibits (which they did not). Mr. Harris is on the record reviewing one such exhibit -- a voluminous Excel spreadsheet produced by Defendants in native format, which I shared as such on ZOOM screen-share function and let Mr. Harris assume control over it. Mr. Harris started with page 1 of the spreadsheet, moving the cursor up and down, side to side, diagonally, then up and down again, with no apparent rhyme or reason, and with no information to be gained through such haphazard review and then turning to the next page and doing the same. You all saw it as it was shared on the ZOOM screen. He then turned to the next page, and proceeded with the same mindless operations. When Mr. Harris got to page 5 of a 23-page spreadsheet with thousands of lines, I noticed that the spreadsheet is only one of two tabs in the exhibit, and realized that Mr. Harris' complete review of the full document as instructed by Mr. Bunis would waste extraordinary amount of time, particularly since my only question about the document was to explain the semantic difference between the entry descriptions "Matched with S/N" versus "Like for Like." I was compelled to withdraw the exhibit and proceed without it, also

on the record. I was similarly compelled not to show the witness Defendants' privilege log where he appears in 76 communications, because Mr. Bunis committed that he would instruct Mr. Harris not to answer any questions until Mr. Harris reads the 71-page document with its 834 chronologic entries in full.

With respect to (b), Mr. Bunis has frequently appeared as the slowest reader in the room, the last one to look for or find the relevant page, passage or paragraph, and the last to read it. There were indeed occasions on the record where Mr. Bunis prevented the witness from testifying even after the witness had completed the reading of the full exhibit because Mr. Bunis himself had not.

With respect to (c), the record is clear that I have introduced exhibits in the form of relevant extracts or screenshots in lieu of multi-page exhibits as a way of dealing with Mr. Bunis' obstruction, and for no other reason.

We will argue bad faith and severe deposition misconduct on Mr. Bunis' part, and we are confident we will prevail. Mr. Bunis first exhibited his misconduct during Mr. Raina's deposition, and has taken it to another level with Mr. Harris. In my 20-year practice before state, federal and international courts, governmental agencies and arbitration tribunals, I've never encountered such a misconduct; indeed, an instruction for a witness to read a complete 150-page single-spaced Form 10K (Annual Report) of a company, which is a typical exhibit in corporate disputes, would have effectively terminated depositions, and would have been met with scorn and laughter by other lawyers in the room. And I am careful to add that my objection is directed solely at Mr. Bunis and not at other Defendants' counsel, including yourself and Anthony, nor do I have any reason to believe that any other counsel for Defendants would exhibit similar misconduct.

Indeed, in the midst of Mr. Harris' deposition, I promised Mr. Bunis that I would consider employing the same stalling tactic against Defendants on the principle what's good for the goose should be good for the gander. Upon further consideration and after sleeping on it, I have concluded that I simply cannot bring myself to engage in such misconduct even though under the circumstances it would appear as a proportional and reasonable response. I have concluded that this conduct is unprofessional,

unethical, and constitutes discovery misconduct; I have never engaged in anything like that before, and have no desire to compromise my professional standards today because of a Mr. Bunis from Boston. So instead of debasing myself to Mr. Bunis' level, I will just ask the Court to sanction Mr. Bunis himself for his misconduct. If the Court denies my motion and approves what Mr. Bunis is doing, then I may have to reconsider.

As you can see, the motion writes itself. However, in the interests of time and to allow everyone to focus on the upcoming two intense weeks of depositions, I'll agree to defer our motion, with full reservation of rights, if Defendants commit (1) that any attorney other than Mr. Bunis defends deposition (Mr. Bunis will be free to take any depositions, of course), and/or (2) whoever defends depositions would abstain from a-c above.

95.    In addition to the above, Mr. Bunis instructed witnesses not to answer questions concerning non-privileged communications, including instructions not to reveal the identities of the parties to such communications, with no conceivable good-faith basis for such instructions. In fact, during Mr. Bartley's deposition, Mr. Bunis issues a long series of such instructions without even any pretense of protecting privileged information, thereby effectively shutting Mr. Bartley down on whole areas of critical testimony with no good-faith basis whatsoever. See ECF 419-3.

96.    Mr. Bunis unilaterally announced breaks during pending lines of questions and discussed the witnesses' testimony with the witnesses during the break; answered questions for witnesses and/or told witnesses what to say in response to my questions; incessantly interposed verbose speaking objections and made running comments to the witnesses (e.g., making an almost reflective comment to the witness "yes or know, if you know" after the question and before the answer); and employed other stalling tactics such as losing track of the relevant parts of the exhibits being discussed; asking to have the question read back to him even though the witness was ready to answer; and taking more time than the others downloading documents.

97.    During the November 12, 2020 hearing, the Court ordered further depositions in the case to be supervised by a retired Judge (ECF 416-3) – which I wholeheartedly welcomed on the record – and in light of that development and upon consultation with new counsel Quinn Emanuel, Plaintiffs decided not to pursue their motion for sanctions against Mr. Bunis for his deposition misconduct at the time. Nevertheless, Mr. Bunis' obstructive conduct throughout the deposition process must be considered in viewing my own conduct in reaction to it.

### O.   Events leading up to Mr. O'Grady's deposition

**1.  Defendants HPI, HPE and HPFS India designate Mr. O'Grady as their 30(b)(6) witness with respect to the counterfeit investigation in China; then cancel his duly noticed 30(b)(6) deposition and un-designate him.**

98.   Mr. O'Grady was initially noticed to testify in his individual capacity on October 26; at Defendants' request, it was re-noticed his deposition for November 10. ECF 423-1.

99.   On October 2, Plaintiffs served their 30(b)(6) deposition notice for HPFS India's representative, noticing it for November 9. Upon further agreement with Defendants, Plaintiffs re-noticed that deposition for November 11. ECF 423-2.

100.   On October 22, Mr. Quigley represented that "Kevan Bartley will be available to testify as corporate representative regarding topics 1-5 and 7 on the same date as his individual deposition (November 6th); and Jim O'Grady will be available to testify as corporate representative regarding topic 6 on the same date as his individual deposition (November 10th). Pursuant to its objections, HPFS India will not offer a witness on topic 8." ECF No. 392-21 at 10.

101.   I objected later on October 22: "Kevin -- we have 7 hours for Bartley, 7 for O'Grady and 7 for 30(b)(6), and that cannot be accomplished in 2 days of depositions even [i]f Bartley and O'Grady are the designees, so we need to book an additional day for them to testify as 30(b)(6) as opposed to their personal capacities. We'll likewise require a separate 7 hour session with the HPE/HPI 30(b)(6) regardless of whom HPE/HPI designates as its representative. So please let's schedule 2 deposition dates for Defendants' 2 30(b)(6) witnesses. And please make your objection to topic 8 in the HPFS India notice in writing, so we could consider your objection in drafting our HPE/HPI notice or challenge it." Id. at 9.

102.   On October 26, Plaintiffs served their 30(b)(6) deposition notices for HPI's and HPE's representatives, noticing them for November 3 and 5, respectively. ECF 423-3. Upon further agreement with Defendants, Plaintiffs agreed to combined the two HPE/HPI depositions into one 7-hour deposition, to be scheduled on either one of the noticed dates of November 3 or 5 or on any of the remaining days of the following final week of depositions closing on November 13.

103.    While the parties' dispute over Defendants' insistence on scheduling 30(b)(6) depositions within the same 7-periods as the 30(b)(6) witnesses Bartley's and O'Grady's individual depositions continued (see ECF 422 at 4-8), Defendants' counsel consistently referred to Mr. O'Grady as the 30(b)(6) representative of HPE, HPI and HPFS India who would testify on topic 6 of Plaintiffs' 30(b)(6) deposition notice -- "The 2013 counterfeit investigation of the part of the Equipment seized by the Chinese police." Notably, none of Defendants HPE, HPI and HPFS India produced any documents in this action, and neither did Mr. O'Grady, even though he was one of Defendants' six designated ESI custodians.

104.    On October 31, I wrote to Mr. Saso: "Please confirm whether a combined HPI/HPI 30(b)(6) representative will appear on Tuesday, November 3 (noticed for HPI) or November 5 (noticed for HPE), since we've agreed to have one 30(b)(6) binding both Defendants after we served our deposition notice, and both noticed dates open for one combined HPE/HPI designee." ECF 423-4.

105.    On November 1, I wrote to Defendants' counsel with respect to "next week depositions," stating *inter alia*: "Please confirm . . . HPI/HPE 30(b)(6) on either Nov. 3 or Nov. 5 (previously noted for HPI and HPE representatives respectively)." ECF 423-5.

106.    On November 2, I again wrote to Defendants' counsel, first at 12:21 am to Mr. Saso, stating (ECF 423-6):

> I have previously served deposition notices for HPI's 30(b)(6) witness for Nov. 3, HPE's 30(b)(6) witness for Nov. 5, and HPFS India's 30(b)(6) witness for Nov. 9.
>
> We have since then agreed to combine HPI/HPE 30(b)(6) depositions; please let me know on which of the noticed dates of Nov. 3 or Nov. 5 to expect the HPI/HPE 30(b)(6) witness or provide alternative suitable dates. The dates that you have previously provided are unsuitable as they coincide with the dates when HPI/HPE designated representatives are noticed to be deposed in their individual capacities for full 7 hours each day. Also please confirm whether HPFS India's 30(b)(6) witness currently noticed for Nov. 9 is expected to testify on that day, or on Nov. 11 which you had previously reserved as a day for 30(b)(6) depositions. If you do not provide suitable alternatives dates and your 30(b)(6) witnesses do not appear on their duly noticed deposition dates, I will move for sanctions. Please let me

know as soon as possible as I am in the process of booking
Esquire court reporters for Nov. 3.

107.   Having received no response, I wrote again at 9:40 am (while
defending Ryan Quinn's deposition) to Mr. Quigley: "Please let me know if you
intend to produce an HPI/HPE 30(b)(6) tomorrow, Nov. 3, as noticed? I need to tell
the court reporter." ECF 423-13.

108.   Later on November 2, Mr. Quigley responded: "As we've stated
multiple times now, the noticed dates of November 3rd and 5th do not work for
Defendants' 30(b)(6) witnesses. We are trying to confirm availability on November
13th in addition to November 11th." ECF 423-7.

109.   I responded on the same day (ECF 423-8):

Kevin -- since Defendants have unilaterally cancelled the
deposition of HPI 30(b)(6) witness duly noticed for tomorrow and
the deposition of HPE 30(b)(6) witness duly noticed for Nov. 5
(or the combined HPI/HPE 30(b)(6) deposition as agreed on
either of those dates), I have no choice but to cancel the court
reporter booking for tomorrow. Please be advised that unless
you provide me with a suitable alternative date for the combined
HPI/HPE 30(b)(6) witness deposition that is not double-booked
with other, previously noticed depositions, I will move to
sanction Defendants for their unilateral cancellation.

**2.   <u>Defendant Gill's deposition, November 4-5, 2020</u>**

110.   On the night of November 4-5, 2020, Defendant Gill testified (ECF
419-2):

- that no physical inspection of the seized ICT transceivers was ever
  conducted by or on behalf of Defendants, and only partial inventory
  of the seized equipment was conducted by Meng Tao of HP China;

- that H3C did not physically inspect the seized equipment, whether
  "on behalf of HPFS India" or on its own, though Mr. Gill could not
  explain how it was possible for H3C to create the H3C Verification
  Report, with its pictures of the seized ICT transceivers and the
  results of their physical inspection, without conducting a physical
  inspection. ECF 419-2, Tr. 309-11;

- that Mr. Gill's contemporaneous written statement that "H3C inspected the seized equipment" was "not correct," ECF 419-2, Tr. 285/20-286/4 ("Q. 'H3C inspected the seized equipment.' Is that a true statement? A. That is not correct. That was my misunderstanding. Q. H3C did not inspect the seized equipment, right? A. Yes, that's correct.").

111.   Mr. Gill's testimony contradicts Defendants' interrogatory answers signed by Mr. O'Grady, as well as Mr. Gill's own contemporaneous emails with Styller, HPFS India's draft and final 2013 letters to the PSB, also drafted by Mr. Gill, and the parties' Statement of Undisputed Facts on their summary judgment motions filed in 2020 – all of which contain multiple unequivocal references to the "inspection" of the seized equipment conducted by H3C on behalf of HPFS India. The H3C Verification Report produced by Defendants on its face demonstrates the results of the physical inspection of the seized transceivers as well.

112.   Furthermore, Mr. Gill:

- denied that Defendants' privilege log references to the "verification report" were to the H3C Verification Report (in Mandarin) produced by Defendants as such under the bates numbers DEF2807-2817, see ECF 419-2, Tr. 245/10-23 ("Q. Okay. Mr. Gill, there are several entries in the privilege log that refer[] to you in the context of 'reviewing' or 'commenting' or 'editing' the 'draft verification report.' And my question is, is that a reference to this verification report [the H3C Verification Report] or some other verification report? . . . A. It's not in relation to this verification report, and I don't know what other verification report could be referred to.");

- denied any awareness of the verification report of the TT Global transceivers, see ECF 419-2, Tr. /11-14 ("Q: Do you know that there is a verification report of TT Global transceivers? A. I am not aware of any verification report") -- even though it was Mr. Gill who had commissioned the inspection of the TT Global transceivers by H3C; even though that inspection was to determine whether TT Global transceivers were counterfeit or authentic (ECF 419-2, Tr. 158/20-25) ("Q. Did H3C inspect TT Global's transceivers to see if they were counterfeit or not? MR. BUNIS: That's a 'yes' or a 'no,' if you know. A. To the best of my knowledge, yes."); and even though Defendants then instructed TT Global to destroy those transceivers as "questionable" following H3C's inspection;

- could not explain the provenance of DEF2587, a document for which he listed as the custodian and which was produced, uniquely among Defendants' other documents, as a screenshot with unsearchable corrupted metadata; only upon magnification one could read its title "H3C verification report template.pdf" and its date "April 17, 2013," which matches Defendants' privilege log entries of April 17, 2013 referring to email correspondence with the subject line "verification report template."

### 3.  **Kevan Bartley's deposition, November 6, 2020**

113.    The following day after Mr. Gill's deposition, on November 6, 2020, I took deposition of Kevan Bartley, who reported directly to Mr. O'Grady in 2013. During his deposition (ECF 419-3), Mr. Bartley testified that in the spring of 2013, while the PSB's criminal investigation was pending, he had arranged for TT Global to send sample transceivers (from the same Commonwealth Games batch as sold to ICT and seized by the PSB) to H3C for inspection, and that following H3C's inspection Defendants decided to instruct TT Global to destroy its transceivers that were determined "questionable" after H3C's inspection, and to pay TT Global for their destruction.

114.    According to Mr. Bartley's testimony and contemporaneous emails, Mr. O'Grady was among Defendants' key decisionmakers authorizing such destruction of "questionable" transceivers in TT Global's custody from the same Commonwealth Games batch of equipment as the ICT transceivers seized by the PSB – clearly material evidence that would have exonerated the Individual Plaintiffs in China, and would have been a key piece of evidence of counterfeiting in this lawsuit.

115.    Furthermore, Mr. Bartley also revealed the existence of an email sent by Defendants to TT Global with those very instructions -- to destroy its transceivers -- which email was never produced by Defendants even though clearly responsive and non-privileged (and was never listed on Defendants' privilege log anyway).

116.    During the deposition, Mr. Bunis asserted that "this email was produced." ECF 419-3, Tr.197/14-15. After the lunch break, Mr. Bartley attempted to reverse his prior testimony about the email, and Defendants then took the position that the email did not exist.

117.    Mr. Bartley also testified about the existence of another contemporaneous counterfeit investigation in China that involved another company called Shenzhen Kingtech Ltd. but the same parties as with ICT – TT Global, H3C, and HPFS. Mr. Bunis instructed Mr. Bartley not to answer any questions about this investigation, with no good-faith basis for such instructions.

118.    Mr. Bartley also testified that the green oval labels on the transceivers (to which neither side had heretofore paid any particular attention) were "vendor asset ID" labels most likely attached by TT Global to all the parts received from the Commonwealth Games to systematize and keep track of them before the sale to ICT; and further testified that there was no reason for anyone to counterfeit those "vendor asset ID" labels.

119.    These green oval labels appear on all available pictures of the ICT and TT Global transceivers, and are still attached to the ICT transceivers stored in the Boston warehouse.

### 4.    James O'Grady' deposition, November 10, 2020

120.    By Sunday, November 8, on the eve of the last week of depositions, the parties were in agreement that Mr. O'Grady would appear to testify on November 10 in his personal capacity; as a 30(b)(6) designee, Mr. O'Grady was noticed to testify on November 11 on behalf of HPFS India and on yet to be confirmed 30(b)(6) deposition of HPE/HPI.

121.    On Monday, November 9, at 8:22 pm, having given some very careful thought to Defendants' prior conduct and to the significance of Gill's and Bartley's testimony, Attorney Joffe sent the following email to Plaintiffs about Mr. O'Grady (Joffe Decl. Exh. Q):

> He [O'Grady] may not show up.
> They have already decided to pull Bartley from testifying as their 30(b)(6) witness (at least Mike [Bunis] on Friday said they are reconsidering him as their choice).
> O'G is testifying in his personal capacity and then again as 30(b)(6), and if he does not want to lie (and he knows by now what Bartley and Gill testified), I would not be surprised if he is a no show (like sick or something). We'll see. Or maybe he'll leave the deposition after the Fifth Amendment discussion, that would be great, he'll have to be brought back, but before the Judge this time.

122.    Barely an hour later, at 9:29 pm on November 9, Attorney Joffe received the following email from Defendants' counsel Mr. Quigley (Joffe Decl. Exh. I):

> Further to our 30(b)(6) scheduling discussions -- given the tight schedule, we will not be able to prepare and offer a 30(b)(6) witness this week. We do expect to be able to make our witness available next week (perhaps Tuesday or Wednesday). With your assent, we can seek a short extension from the Court. Kevan Bartley will serve as corporate representative for HPFS India, HPE, and HPI for the noticed topics, subject to Defendants' objections. Because of scheduling challenges, Jim O'Grady will no longer be a designee.

123.    Mr. O'Grady did appear for his deposition on November 10 and testified for less than an hour before Defendants' counsel terminated the deposition after the Fifth Amendment discussion.

124.    During that brief questioning, Attorney Joffe elicited the following testimony from Mr. O'Grady:

- Mr. O'Grady had never heard about being designated or undesignated as HPE's, HPI's or HPFS India's 30(b)(6) witness, and accordingly had done nothing to prepare to testify on the noticed topic concerning the counterfeit investigation in China -- even though Defendants had first designated him as their 30(b)(6) witness on October 26, and confirmed that designation ever since and until the November 9 un-designation, and even though his 30(b)(6) testimony had been previously scheduled and cancelled once already, ECF 416-2 at 16-20;

- Mr. O'Grady also testified that he had collected and uploaded under a hundred responsive documents for production, including "documents like emails, PowerPoint, and PDF files" (ECF 416-2 at 34-36) – but none of Mr. O'Grady's documents has been produced by Defendants even though Mr. O'Grady was one of their designated ESI custodians under the Final ESI Protocol, which does not permit de-duplication of non-email files across custodians;

- Mr. O'Grady also testified that he had been asked to collect responsive documents only once, around 2016 (after this litigation already commenced), and to download them on a

"share drive," though Mr. O'Grady could not explain what that share drive was and testified that he could have meant "a virtual location in a public or private cloud." <u>Id.</u> Mr. O'Grady testimony is inconsistent with Defendants' representation to the Court that all ESI custodians (including Mr. O'Grady) downloaded their responsive documents and emails on the Share Drive prior to this litigation; furthermore, none of Defendants' other witnesses, all ESI custodians, recalled any Share Drive collection during their depositions).

125.    Following that testimony, Mr. O'Grady then repeatedly refused to answer my question whether he would testify truthfully even if his answers would expose HP to criminal liability (ECF 416-2 at 54-56):

- "Are you prepared to tell me the truth today, even if that truth exposes your employer, HP, to criminal liability? Are you prepared to do that, Mr. O'Grady?";

- "Are you going to give me your truthful answers today, even if they will expose HP to criminal liability? Yes or no?";

- "Are you prepared to give me a truthful answer, if they expose HP to criminal liability?";

- "Mr. O'Grady, are you prepared to testify truthfully today even if your testimony exposes HP to criminal liability?"

126.    In response to the last question, Mr. O'Grady stated: "I believe I, upfront, indicated I would testify truthfully." ECF 416-2 at 56.

127.    I then gave Mr. O'Grady a warning that he could be criminally prosecuted if he would choose to lie under oath to protect Defendants and thereby become part of their coverup conspiracy, and then offered Mr. O'Grady to take a break to consult with Defendants' counsel with respect to the potential Fifth Amendment waiver should he continue to testify.

128.    As the transcript and the video of Mr. O'Grady's deposition make clear, I warned Mr. O'Grady in no uncertain terms that Mr. O'Grady could be prosecuted - - **BUT ONLY IF HE CHOOSES TO LIE UNDER OATH**.

129.    Mr. O'Grady was right to be concerned about that possibility, because lying under oath constitutes perjury punishable by imprisonment, and the very purpose of my warning was to impress upon the witness that lying under oath could and likely would lead to very serious consequences, including potential prosecution for perjury, and should be taken extremely seriously in the circumstances of this case.

130.    Accordingly, I had and still have a good-faith belief that my warning to Mr. O'Grady to consult Defendants' counsel regarding the Fifth Amendment waiver was fair to Mr. O'Grady (and to Defendants).

131.    I also had and still have a good-faith belief that my warning about the potential Fifth Amendment waiver was substantively correct. My good-faith belief was informed by my prior white-collar defense work, including representation of Computer Associates, Inc., in the DOJ and SEC investigation in the early aughts that saw the company's CEO, General Counsel and other top executives serving real jail time for covering up past accounting fraud and lying about it to the government. It was further informed by the recent legal research that I conducted in November 2018 in an unrelated matter on the issue of the Fifth Amendment waiver, memorialized in my contemporaneous draft brief. A true and correct copy of my draft brief dated November 2018, with the parties' names and other identifying information redacted, is attached as Exhibit A hereto.

132.    More importantly, I was not consulting Mr. O'Grady and was not asking him to take my word about potential waiver for granted – rather, I offered him an opportunity to take a break and consult with Defendants' counsel. As anticipated, Defendants terminated Mr. O'Grady's deposition immediately after that break without allowing him to speak another word.

## I.    <u>The results of my advocacy.</u>

133.    Plaintiffs' narrative of the events, first created by in the form of the original "concise" state court complaint and subsequently developed into the operative 93-page Second Amended Complaint, has survived multiple substantive and procedural challenges over five years of scorched-earth litigation.

134.    None of the underlying 13 claims, 12 Plaintiffs, or 5 Defendants have been dismissed from the case; to the contrary, the key false imprisonment claim, once dismissed, had been successfully revived and reinstated in the Second Amended Complaint.

135.    Plaintiffs' expert witness Prof. Fang survived the <u>Daubert</u> challenge with his credibility intact and testimony intact, saved for his reliance on H3C' Security Bulletin published on H3C's official website showing its trademark holographic label on transceivers excluded by the Court as hearsay. Finally, despite the Court's finding of Plaintiffs' spoliation prior to the litigation, Plaintiffs have so far avoided any sanctions for it.

136.    As to the affirmative case, I believe the documentary and deposition evidence elicited from Defendants has so far demonstrated the following:

137.    **Defendants sold counterfeit transceivers to ICT and covered up their crime by destroying exonerating evidence**. Defendants sold one quarter of the Commonwealth Games equipment to ICT (then shipped to China) and the remaining three quarters to TT Global (then shipped to Dubai). After the ICT equipment was seized by the Chinese Police based on H3C's report that the transceivers carried counterfeit H3C trademark labels, Defendants arranged for H3C to inspect TT Global equipment stored in Dubai. After the H3C inspection, Defendants secretly instructed TT Global to destroy its transceivers as "questionable" while the Chinese criminal investigation was pending. The TT Global transceivers and the ICT transceivers all came from the same batch of the Commonwealth Games equipment and bear the same green oval "vendor asset ID" labels affixed to them by TT Global upon their return from the lease and before the sale to ICT.

138.    A true and correct copy of my PowerPoint presentation summarizing Plaintiffs' evidence of counterfeiting on the parties' summary judgment argument (prior to deposition discovery) is attached as Exhibit B hereto.

139.    **Defendants' discovery was a sham and part of their cover-up**. As Plaintiffs had argued on their motions to compel, Defendants' discovery was a sham, for the following reasons:

- Defendants HPE, HPI and HPSF India produced no documents and no ESI whatsoever, while Defendant Gill and three other custodians of Defendant HPFS collectively produced 581 documents – compared to over 60,000 responsive documents produced by Plaintiffs (a small U.S. business, its owner, its Chinese sales associates and their families) -- notwithstanding the involvement of well over a hundred of Defendants' employees in the relevant events;

- Stuart Patterson, HP's Assistant General Counsel directly involved in the 2013 counterfeit investigation in China, and one of Defendants'

designated ESI custodians pursuant to the Final ESI Protocol, was never asked to preserve, collect, or produce any of his emails or non-email files, and was never interviewed by anyone about his business use of text messages and instant messages; none of his emails, files or texts had been produced by Defendants, ECF 423-11, Tr. 41-43;

- Mr. Patterson further testified that in 2013 he was the direct manager of Jessica Liu, the head of H3C legal team in China who herself was in direct contact with H3C's auditor Wang You, who had in turn testified to the PSB in 2013 -- and again in 2014 -- that the ICT transceivers were counterfeit, and who had also tested the TT Global transceivers at Defendants' request, leading Defendants to destroy them in 2013 due to their "questionable" nature or origination; id., Tr. 80-82;

- Mr. Patterson further testified that Jessica Liu was HP's employee in 2013 and reported directly to Mr. Patterson in HP's US headquarters – and not H3C's employee as Defendants and their counsel had repeatedly misrepresented her to be, id.;

- Based on their misrepresentations, Defendants did not search for or produce any of Jessica Liu's documents or ESI;

- Mr. O'Grady testified that he had collected under a hundred responsive documents, including emails and non-email files, and uploaded them for review and production – but none of his documents were produced by Defendants;

- Mr. Harris testified that he had collected and uploaded "hundreds" of responsive documents – but Defendants produced only six of his documents, three of which (50%) completely irrelevant, ECF 423-12, Tr. 50-58;

- Defendants' witnesses testified to their business use of phone text messages and/or instant messaging applications such as Microsoft Link, Microsoft Teams and/or Skype for business communications during the relevant period, but none recalled being interviewed by Defendants' counsel about any such use, and no texts or instant messages were ever produced by Defendants (ECF 423 ¶ 30);

- None of the witnesses deposed so far had mentioned any "Share Drive" collection as represented by Defendants to the Court except for Mr. O'Grady, who had, however, also testified that by the "share drive" he might have meant the "cloud" (ECF 423 ¶31);

- After Kevan Bartley testified at his deposition that Defendants sent an email to TT Global with instructions to destroy its transceivers, (ECF 419-3, Tr. 196), I requested immediate production of that key non-privileged correspondence, to which Mr. Bunis responded on the record that "this email was produced" (id., Tr. 197/14-15); however, after the lunch break, Mr. Bartley attempted to change his testimony, and Defendants' counsel subsequently changed their position and insisted that the email did not exist.

140. **Defendants committed fraud on the Court in pursuit of their coverup.** In his Declaration in Opposition to Plaintiffs' Renewed Motion to Compel, sworn to October 18, 2019, Defendants' counsel Paul Saso stated that "[d]uring the relevant time period, Jessica Liu was an employee of H3C and she acted as in-house counsel for that company." ECF 258 at p. 5, ¶ 40; <u>see</u> <u>also</u> <u>id.</u> ¶ 43 (referring to "Jessica Liu, an H3C in-house attorney").

141. However, on November 12, 2020, Stuart Patterson, HP's then Assistant General Counsel, testified at his deposition that Jessica Liu was an employee of HP during the relevant time period, not of H3C, and reported directly to Mr. Patterson. ECF 423-11, Tr. 80-82.

142. Mr. Saso also made the following statements in his Declaration, ECF 258 at pp. 5-6:

> 44. Defendants produced a document referred to as a "verification report" in their privilege log.
>
> 45. Separately, there is a second document logged on Defendants' privilege log, which was contemporaneously referred to as a "verification report." That document relates to two sample devices that were sent by TT Global to H3C at the request of counsel for the purpose of providing legal advice.
>
> 46. That second "verification report" was specifically generated at the direction of counsel."

143. Mr. Saso further made the following statements on the same subject in his Declaration in Opposition to Plaintiffs' Motion for Reconsideration of the Order Denying their Renewed Motion to Compel, sworn to December 10, 2019, ECF 292 pp. 5-6:

> 36. Separately, the verification reports were created by H3C — not Defendants.

37. One verification report is a document submitted by H3C to the Chinese authorities apparently explaining its position concerning the counterfeiting allegations, and the other verification report is a document created by H3C relating to sample devices that were sent by TT Global to H3C.

38. To the extent the share drive contained copies of H3C's verification report to the Chinese police, they were produced; to the extent the share drive contained communications about that verification report, they were either produced or withheld as privileged, depending on the email.

39. Whether located in Defendants' emails or the share drive, Defendants already produced all responsive, non-privileged documents concerning the verification reports.

40. Defendants' Privilege Log Entry 410 discloses an "[e]mail containing the legal advice of Jessica Liu enclosing verification report and draft letter."

41. This entry refers to the verification report concerning the two sample devices sent by TT Global to H3C at the direction of counsel and clearly designates it as privileged.

144.    Thus, according to Mr. Saso's declarations, Defendants' privilege log entries concerning a "verification report" refer either to (1) H3C's verification report of the seized ICT transceivers (produced by Defendants as an 11-page document in Mandarin under bates numbers DEF2807-2817), or (2) H3C's report of the TT Global transceivers (purportedly withheld as privileged because it was created at the direction of counsel).

145.    However, subsequent discovery and deposition testimony by David Gill and Kevan Bartley put a lie to those statements. Thus, Defendants produced a non-searchable and non-readable without magnification screenshot of "H3C verification report template.pdf" dated April 17, 2013, under bates-number DEF2587, while Defendants' privilege log entries of that day likewise refer to the "verification report template." The screenshot itself is of one-page draft document in Mandarin that resembles in appearance the initial report filed by H3C with the Chinese Police in December 2012 calling for the prosecution of the Individual Plaintiffs for selling counterfeit equipment. A true and correct copy of DEF2587 is attached as Exhibit C hereto.

146.    This "H3C verification report template" is neither the 11-page H3C Verification Report produced by Defendants nor the TT Global verification report purportedly withheld as privileged – the only two "verification reports" referenced by Mr. Saso in his declarations as appearing on the privilege log, making those declarations false.

147.    Furthermore, neither David Gill who commissioned H3C's inspection of TT Global transceivers, nor Kevan Bartley who had personally arranged for that inspection, had ever seen the TT Global verification report, according to their deposition testimony; nor is the purportedly privileged TT Global verification report listed on Defendants' privilege log.

## CONCLUSION

148.    To litigate a case like this necessarily requires creative and zealous advocacy persistently maintained over the years in the face of formidable and well-heeled opposition.

149.    I sincerely believe my track record demonstrates that zealous advocacy, which has preserved and greatly advanced Plaintiffs' cause without crossing the line into impermissible misconduct that may require discipline.

February 22, 2021                                  Respectfully Submitted,

_____

Dimitry Joffe
JOFFE LAW P.C.
765 Amsterdam Avenue, 2C
New York, New York 10025
(917) 929-1964
Email: dimitry@joffe.law